Good morning, everyone can be seated. Okay, let's call the first case. Case number 09-3342, Ronald Castello v. City of Chicago. Will the lawyers who are going to argue the case please approach and tell us who you are. Good morning, Your Honor. It's Chris Norberg on behalf of the City of Chicago. Good morning, Your Honor. William J. Quinlan on behalf of Robert Castello and Trisha Gallo. You understand you have 15 minutes? You'll reserve some time for rebuttal. 15 minutes in total, Your Honor. Okay, let's proceed. And if I may ask, would you reserve time before you start or just stop? Oh, just remember yourself what you have to do. Okay. Mr. Quinlan. Good morning, Your Honors, Madam Justice. This matter was brought by Ronald Castello and Trisha Gallo as tool on behalf of the class of all persons or entities that have sustained damage to real or personal property as a result of the diversion of storm water from public streets to private property resulting from the City of Chicago's installation, operation, and maintenance of a modification to the city's sewer system with an inlet control device commonly known as a rain blocker beginning in August 2001 to the present. The class, this class, was certified by the trial court December 16, 2005. And the origins of this case begins when the city tried to alleviate flooding throughout the City of Chicago. They did so by approaching a company by the name of Harza Engineering or Harza Environmental. It's either the city approached or the company approached the city. It's one of those two. That's correct, Your Honor. You went through a trial. You had the opportunity to present your case. And you at least initially contest that you weren't able to present your best case. That's correct, Your Honor. As we attempt to lay out in the briefs, there was circumstances where originally trial counsel was afforded or was appointed by Mr. Castello and Ms. Galvez to counsel, was unable to proceed forward, was not prepared. And that was at what point in the litigation due, time-wise? Time-wise, it was, the case had been set for trial. So discovery had been completed at that time. Eight years would be about right, though, wouldn't it? That's correct, Your Honor. I mean, eight years, the case had gone on. There had been multiple amendments to the complaint without a doubt. And then at the point where trial was set and trial date was given, I believe it was counsel, trial counsel on behalf of the plaintiffs files a motion for substitution of counsel. No, that's not correct, Your Honor. Trial counsel asked for a continuance so that he could properly prepare for trial or take steps to prepare for trial. He showed up. One continuance was denied. Then trial counsel filed another continuance, which was not ruled on by the trial court. Trial counsel showed up, appeared on the day of the trial and asked again or pleaded for a continuance. The trial court judge said, you're not going to continuance. Asked trial counsel to go out in the hall and come back and begin the case. Trial counsel, from what I understand, came back, said he could not proceed with the case and needed more time to adequately prepare to represent the plaintiff and the class. At that point, the trial court continued the matter to replace trial counsel and continued the matter 30 days. The present counsel, myself and Ms. Hegedus-Quinlan and others stepped in to try and handle the matter. Okay, stop right there. Yes, sir. When you say you stepped in, when you stepped in, you certainly knew of the posture the case was in. You certainly knew the rulings of the court in terms of what she wanted done fairly quickly. And knowing all that, you filed your appearance. That's correct, Your Honor. And at the same time, the time we did file our appearance, we did ask to reopen discovery because we did know the posture of the case and we did know the rulings of the court. And that was the reason why, at that very point, we asked to reopen the case. And we specifically asked to reopen it with respect to requests to admit, requests to 213, and additional discovery so that we could put on, to use Your Honor's phrase, our best case. And when you say a 213, a 213 is simply a shortcut means to shorten the case because you want admissions. That's correct, Your Honor. But you could, without a 213, you could certainly prove up your case the hard way. We contend you could prove it to a point, but we couldn't prove it to the satisfaction of the court, that when we appeared that day and when the case was set to trial, that given the posture of the case, that it was unable to prove the case to the satisfaction of the court. For example, the court spent some time saying that our expert, which we disagree with the court's opinion on this, had to go out and inspect Mrs. Galvez-Tool's home, as the case was structured at the time that we came into the case. I'd like to discuss that issue, too, but let's, just so it's clear, when new counsel came in, you and co-counsel. That's correct, Your Honor. Time was given to prepare. It wasn't an immediate trial date. No, I'm not complaining that we didn't have an adequate time to prepare to deal with the case that was laid out at the time. It's only a discovery. Correct. It's purely a discovery issue. So I don't feel that the court forced us to try a case where we personally didn't have time to adequately prepare. And to some extent, and we all know the standard overview for a discovery issue. Correct. That standard that is the most deferential. Correct. And it would obviously be our position that the difference in the cases that we cite that do it here is, or excuse me, the cases that we cite that are relevant to this issue, that specifically the court was looking for information which we sought to provide it. There was no trial date that was set. We were willing to do it in expedited fashion. To use Your Honor's words, we knew the case that we stepped into. It was obviously a very, very unique circumstance. I believe the trial court knew that. We had not worked on the case before. No one involved had worked on the case before. We were trying to both get ourselves familiar, but also provide as much information we could to represent the class and see that justice was done. You felt that you needed more discovery and you didn't get it. But you knew what the elements of the case were, don't you? I mean, did you know what the elements, what you had to prove? We do. And as we said in our brief, Your Honor, we think we did prove that. And how did you prove proximate cause? We proved proximate cause by two ways, Your Honor. One, Ms. Galvez-Tool took the stand and testified that, one, she had flooding. Two, that the street in front of her house did not satisfy what I will say the HARSA plan, the plan that HARSA engineering laid out as to how the rain blocker system should be implemented. And three, we put an expert to testify based on looking at the flooding that occurred in 01, 04, and looking at the pilot areas, looking at aerial photographs, reviewing various data, that the flooding that did occur, the data being how the rain blocker system was implemented and as well as the reports from the various people complaining of flooding, that the flooding occurred to the best was approximately, the flooding occurred as a result of the improper installation of the rain blocker system. But did the trial court find that you failed to prove proximate cause? The trial court did find, and we believe that we did prove it, but with a combination of both the expert's testimony plus Ms. Galvez-Tool saying specifically that her circumstances were not within the HARSA plan. And when the expert testified that because of improper implementation of the rain blocker system, not according to the HARSA plan, resulted in overland flowing, when you combine the two, proximate cause is proven. But did your expert say that based on a reasonable degree of engineer certainty that there was proximate cause? Did your engineer use those words? The engineer did use the word based on a reasonable degree of engineering certainty. In fact, the trial court... That there was proximate cause. There was proximate cause to, yes, not specifically with respect to Ms. Galvez-Tool, but there was proximate cause to the flooding that resulted and the damage that occurred and the basis for the complaint that there was proximate cause. The expert did use those words, Your Honor. I was going to ask you, young man, there was another expert, though, the city's expert. Correct. The city's expert said that the system was not the proximate cause of the flooding and that there was no way that the plaintiff's expert, if I'm correct, I think I am, there was no way that the plaintiff's expert could say that the rain blocker system caused the specific damage to your plaintiff's property without specifically looking at the circumstances of your client's property. I believe what the plaintiff's expert said was two things. The plaintiff's expert said, one, that he wasn't in a position to make a determination about what the proximate cause had occurred because he believed that modeling was the term that he used over and over had to occur in order to do that computer modeling. I think that's what he was talking about at the time. And he said, with respect to his critique of our expert, was that, and I just want to cross again, was that he couldn't say whether or not the installation, I don't think he used the word improper installation that I would use, of the rain blocker system would cause the overland flooding. He couldn't say that one way or the other. All he could say is in order to make that determination, you would have to use a computer modeling system to do that. So he was contesting what your expert said? He was contesting what he was saying, but he was not affirmatively saying that it wasn't the cause. He was saying, here's what I believe you would have to do in order to achieve that. And one of our other contentions was in order to do the modeling that he was talking about, you would almost have to, in 2001, start the process immediately after it happened because you would be recreating something. You wouldn't have, unless you had the systems in place at the time it rained, you wouldn't have the exact precise analysis that the expert was looking for because obviously you wouldn't be complaining about it until it already occurred. All right. I want to make an assumption. If we assume that the engineering standard is the proper standard and that the city breached the standard and that the city does not have immunity, if the judge ruled that you didn't prove proximate cause and it's an abuse manifest way, how can we change the judge's decision when there's evidence in the record that shows, or that supports the judge's position? And one is from your client who says that they had flooding in 2001 and one is they didn't have flooding in 2004 or 2007. I can answer that three ways. The first is directly, our client testified that she said she had flooding in 2001, 2004, and 2007. 2004, she said that originally she said she thought the rain blocker system had been removed from her street in 2004. She later testified that she wasn't sure it might have been 2007. But it was a credibility assessment. And when you read the judge's ruling, doesn't the judge basically say she's not telling the truth if the system was gone in 2004 and 2007? Well, assuming that's correct, Your Honor, one of the other issues that we raised was subsequent remedial measures. We brought a motion because all the rain blocker systems did have to be removed because of exactly what we were complaining about. The court denied that and said that it was a subsequent remedial remedy and therefore she wouldn't let it be admissible. I didn't see on the record that all of the systems were removed. If I recall reading that there were some sewer systems that were enlarged. Some sewer systems were enlarged, but the rain blocker system, so the little, I'm going to call it like a filter, it kind of looks like a beater that you kind of flip on, spins, kind of looks like that and it's basically a filter. Those were all, at least my understanding was in the record, those were all subsequently removed. Sewer systems were enlarged. I'm happy to look at that and bring that to the court because we raised the issue of, in fact, specifically we called a witness, a former commissioner, to deal directly with that issue and obviously brought it before the court. The court denied the idea of putting it. Did you raise the evidentiary issue regarding the preclusion of the subsequent remedial remedy as trial error? I didn't see it in here. I think we raised it generally, Your Honor. We did raise it in the court. It wasn't as far as the major issues that we raised. We specifically do raise in the brief, the answer to your question, we respond to the idea that the trial court raises the issue with respect to Ms. Galvez's tool and the removal of the rain blocker systems. We specifically do respond by talking about the subsequent remedial motion that we made and how the court wouldn't allow that in. So we raise it in that respect, Your Honor. And, of course, proving proximate cause is a factual question, and you simply have to prove it by preponderance, 50 plus 1 or 50 plus whatever. Let's say the proximate cause issue was an absolute tie, and the trial judge says no proximate cause. She calls it the way she sees it and says no proximate cause, and here we are reviewing her decision. And if the evidence is equally split, how do we get past the manifest way standard? I'd say two things. One, I would say, Your Honor, that the trial court specifically says the reason there's no proximate cause is, well, she really says twofold. One, the testimony of Ms. Galvez's tool, so even if you put that aside. And, two, the fact that plaintiff's expert did not go out and provide an analysis of Ms. Galvez's tool's property. And I think that brings us back to the discovery question that we raised and we said we would do. So it makes it a little unique than if it was. Here's the interesting thing about what you've just done when you said it goes back to the discovery question, because you basically said, well, maybe you're saying it in this way, that to the extent you couldn't prove proximate cause, it's because the discovery you sought, you weren't given. But that's sort of a maybe a slight admission that if proximate cause wasn't proven, it was for this reason. I'm not trying to make an admission. I'm trying to answer Your Honor's question where you said hypothetically assuming it's 50-50. And I said what would make this a little different is two things. One, we raised the issue that we directly would have addressed that issue. I don't think it's necessary. Okay. Here's the point that I think you were raising and the one I said I'd like to discuss a little. And that's concerning the experts not going to Ms. Galvez's home. Right. And I don't know if that turns on the nature of this lawsuit, that it is a class action lawsuit with a representative. And the representative seeks to stand in the shoes of those similarly situated. And to the extent that you are going to take this person's case and extrapolate to all the other members of the class, it seems to me that your burden would include establishing that the representative is a true representative of the class. And that would include having your expert review the representative's problems that she was incurring due to this negligence or alleged negligence. I think the expert did review the problems that this representative and Mr. Costello incurred. He just did not go to her house and provide a specific analysis as to. How did he do it? He did it by review of deposition testimonies, review of documents relating to flooding within specific areas. He did it with respect to aerial photography of different areas. He did not go out, I think, with the court. Was he asked a question and did he say, I didn't have to go there because I had all the information I needed? I don't believe he was asked the question. I don't believe the issue became an issue to the opinion as far as specifically. I don't specifically recall that he was asked the question that the court raises. I do believe he was asked the question about whether or not proximate cause occurred. He was asked the question as to how he believed that there had been proximate cause with flooding. He was asked multiple questions and he was on the stand for two days dealing with all the efforts, all the research, all the steps that he took to make the determinations that he did. With that, I'd like to reserve what other time I have left for rebuttal. Thank you. Good morning. May it please the Court. After a week-long trial in this case, the trial court made two specific findings of fact. The court found as a matter of fact that the city did not proximately cause the damage to the representative plaintiff's property and the court found as a matter of fact that the city did not breach any duty owed to the plaintiffs. Neither of those findings are against the manifest way of the evidence and that alone is enough to affirm in this case. Well, to some extent, the way she resolved the proximate cause issue, it borders on a question of law almost or such a clear-cut example that you can treat it as a question of law. It's not like a situation where, you know, one witness says it's a red light, the other witness says it's a green light, and really no one can really tell. I mean, here the evidence either there's a connection between the evidence that was presented and the injury that was caused or there wasn't. And it seems like the question was that the evidence simply failed completely, and that gets close to a question of law. How much deference should we really give when she's ruling in that manner? Well, I think to the extent, I appreciate what you're saying, to the extent that this has the appearance of a question of law, I think it is with regard to the fact that the court recognized correctly that in order to prove their case with regard to proximate cause, the plaintiffs needed to offer proof about Galvez Tools' specific property and needed to focus on that. As the panel recognized, this is a class action. There was one representative functionally at the trial, and that was Galvez Tool. In order to win their case, they needed to prove that all the elements of the case with regard to her property staying on proximate cause, they needed to show that but for the installation of the rain blocker, the inlet control device on Kedzie, there would not have been flooding. Now, what they failed to do utterly, and what the court recognized, and then perhaps in a sense ruled as a matter of law they therefore could not prevail, was to focus on that property and to give meaningful and complete and fulsome treatment to the evidentiary issues regarding that property. All they have in the record and all they presented was Mrs. Galvez Tools' testimony regarding one of the many elements, one of the many variables involved in whether or not the rain blocker system might have somehow participated or played a role in causing the flooding, and that is the height of the curb, and her own firsthand testimony that when the rain occurred, I don't recall if it was the first or the second storm, that she stood and she saw the water coming up over the curb. Now, as our expert testified, that testimony does not necessarily mean that the rain blockers had anything to do with the water flowing over the curb, and as our expert testified, in order to really know, to understand for sure whether or not there was causation at that particular property, you needed to consider all the different variables and you needed to actually go out and make an assessment of whether and to what extent the installation of the particular inlet control device there caused the flooding. So, to return to the question of whether this is a question of law or a question of fact, ultimately, I would submit that it is still a question of fact as to whether or not there was sufficient proof of proximate cause, 51 to 49, showing that the installation of the rain blocker did cause the flooding at this property. But I appreciate what the court is saying. What about the removal? When did that occur? As of the plaintiff's opening brief in this case, it was undisputed that it occurred in 2001. In the reply brief, they cite to, they put a record cite to apparently uncertainty in the record with regard to Ms. Galvestule's recollection of when the actual replacement took place. However, it's, the standard again here is against the manifest way to the evidence. You have testimony that, from Ms. Galvestule, that in 2001 she asked for it to be removed and it was removed, and then perhaps later in her testimony saying, well, I'm not sure, maybe it wasn't until 2007. Now, I wouldn't say the court needs to find that the trial court here deemed that second correction amendment of the testimony a lie, but obviously in the findings of facts in the trial court's opinion, she found that they were removed in 2001. And on the testimony on this record that cannot be deemed against the manifest way of the evidence, at the very most you have testimony, equal testimony on both sides. One that it was in 2001, one that it was in 2007, and they're equal, therefore there's no manifest way issue here, and therefore the finding of fact must stand. That finding of fact, again, was that they were removed in 2001, but the particular one in front of the Kedzie property was removed in 2001. And that just adds on to the approximate cause problem they have, as the court recognized it's only part of it, we would submit, part of their failure of proof. But it is a very strong part of their failure of proof, the fact that flooding occurred even after these inlaid control devices had been removed. I'm sorry, wasn't there some testimony, at least, or an implication in the judge's ruling, I'm trying to think back on it, that even though the plaintiff said there was no flooding prior to the installation, that the plaintiff said elevated the wash and dry and things like that in the basement, certainly an implication that there may have been some flooding in the basement prior to them. Yes, that's right, there was evidence that there were two foot risers, I believe, in the basement for the dryer and the hot water heater. As to whether or not the court considered that in her, I don't believe, and I have to recheck the trial court's opinion, I'm not sure whether she found as a matter of, included those in her findings of fact, but there certainly was evidence to that effect. And ultimately, what you have here is this sort of circumstantial evidence that the rain blockers did not cause the flooding, the timing of the removal, but also you just have a failure, an affirmative failure of proof, which standing alone, setting aside this 2004, 2007, 2001 issue, was enough to prevent plaintiffs from proving their case. They had one representative plaintiff, they had one property, all they needed to do to prove their case was to prove that the flooding at that property was caused by the rain blockers and they did not address all the variables that they needed to do. Now ultimately this case, in a sense, came down, or this issue rather, came down to a battle of experts and our experts said in order to make a meaningful and credible determination of whether or not there was causation at this property, you need to study the property. It seems like common sense. Their experts said no, all I needed to do was consider the general properties and the operation of this rain blocker system and I could discern from that, that essentially every property that was flooded was caused by the rain blocker system. Now that level of generality was understandably and I think legitimately rejected by the trial court. And so as a result you have a finding of no proximate cause and that standing alone is enough to prevent plaintiffs from prevailing in this case. Now aside... What if the expert had testified that going to the house would not have added any information to what he already had? That it wouldn't have disclosed anything short of waiting for a huge rainfall, short of being there when the flooding occurs to be able to decide where, or to be able to investigate where the real cause is. Why should it make any difference that he didn't actually go to the house? Essentially that is what he said, Justice Garcia. He said, I didn't need to go to the house. It wouldn't have changed the outcome. So do you think the trial judge should be put in the position of saying to an expert that I hear you, but I disagree with you. I'm ruling that you had to go to the house. And this is an expert. This is an individual who has been trained in that field. Why should the trial judge be able to tell an expert how to do his own job? Well, two answers to that, Justice. First, perhaps in a situation where there was one expert, a plaintiff's expert, in the case and had made that representation, perhaps it would not be wise for the judge to say, well, I'm going to second guess you myself as a judge. I don't think it would necessarily be improper or grounds for reversal even in that case, because ultimately it is the trial judge's job to assess the weight to give to the expert's testimony. But what happened in this case, the second point I want to make, is that you have competing experts. And so although you had Chang saying, I didn't need to go, you had Nicolau saying you did need to go. And here's why. And explaining why you need to go and why you need to know the measurements, the various variables here, and the judge here, understandably, once again, sided with the city's expert and the determination that in order to prove a class action with one representative plaintiff, you need to focus on the representative plaintiff's case and you need to go through the proof for that case in order to prevail. But what you're really saying is that even if this had been an individual action, she couldn't have proved her own individual case, much less the representative. That's absolutely right. I mean, and what this came down to, given the certification of the class and the choice of the representative and proceeding with that representative, this essentially was an individual case that was going to accrue to the benefit of an undetermined size class. All that they needed to do was prove this one person's case and they failed to do it. And the determination on the proximate cause issue was not against the manifest way of the evidence, nor is the determination of the breach issue, although we're willing to stand on our brief with regard to that argument. And I would like to touch briefly on the immunity issue, because even if you get past these liability concerns, you get to the immunity, which the trial court did not need to explain, go into detail about why it determined that there would be immunity. But I think this is the quintessential 2201 case. You have a city official who is in a position to make policy with regard to the operation and how the sewers are maintained and put together. And he made a decision that was not an engineering decision. It was a political, public interest, public health decision to proceed. He decided to proceed. He exercised his discretion in making that decision because it was his job, the discretion was in his office, and he... Let me sum up what you're saying is that the immunity issue, the immunity question was the nail in the coffin, but the body was already in the coffin when she ruled, when that nail was put in. That's absolutely right. It's belt suspenders and whatever third option one might need to keep your pants on. So, yes, it is not necessary that the city prevail on all three of these arguments, two of the three of the arguments, only necessary for the city, the defendant, in this case, to prevail on one. And it is clear from the record that the city did and should prevail and the court should affirm them. So unless the court has any further questions, I'm going to sit down and we'll stand on our brief with regard to breach and we ask that you affirm the judgment of the circuit court. Thank you. Thank you. Your Honors, I'll be brief in my rebuttal. As I believe we laid out in our brief and we discussed, the city at one point commissioned HARSA to provide three pilot studies. They provided those studies. They acted in accordance to rules and regulations they established. They followed those study work, those studies work. At some point the city made the decision to implement that citywide. They made that decision. We've taken that decision alone. It may qualify under immunity. Then they established to move forward with a plan to implement those RainBlocker devices and they did not implement those RainBlocker devices according to the plan that HARSA established and according to the pilot studies they spent years completing and millions of dollars doing. In so doing, HARSA also at the time that they did those pilot studies notified the city that to deviate from the rules and regulations, what they had established, could cause problems and could cause overland flooding. The city went forward, did that, using the pilot studies as a basis to roll it out citywide. Let me get this right. You think that when a city exercises its discretion to implement a policy, it has to implement that policy by crossing every T and dotting every I, exactly the way the policy is laid out. If you don't, then you're subject to possible negligence action. I would say the general answer to your question is yes, but especially in a circumstance like here. But it doesn't leave a whole lot of discretion for the city. Well, the discretion is the initial decision to roll it out and then once you decide to roll it out, and especially with here, the basis for implementing it citywide was these pilot studies. So that was the crux. They made the decision to implement it. And then when they implemented it, in answer to your question, I think if that's the basis, then yes, you should follow the policies, especially in a circumstance like here where you're forewarned to not follow the policy, you could have the circumstances that occur here. Sorry. I'm sorry, Your Honor. I was just going to say, doesn't the policy say go block by block for 43,000 miles of the city? Determine it with the size of each inlet? What the policy says is a block by block analysis is necessary to determine. I don't know if that necessarily means you need to walk block by block. I think what that means is you have to set up a system where you can evaluate if there's no curbs, for example, the people that are out deciding whether to put in the rain blockers would make a determination as they were doing that going forward. In the pilot studies, they didn't just implement it the way the city did citywide. The way they did it in the pilot studies was they did make some evaluation. They had different size restrictors. They made unique decisions whether to put them in certain areas or not. That, I think, is what you would do on a citywide basis, just what you did in the pilot study. The whole purpose of the pilot study is to look at it and say, does it work here? If it works in these unique circumstances, this is how we should do it citywide. So our answer to your question would be you should do it citywide the same way you did it in these. In other words, four pilot studies, three years, millions of dollars. It's not just one block where they're trying to. There's also testimony that the city said that the cost to do this was reduced because they priced the restrictor. They were able to do it. I think it went from metal to plastic. But the point being there wouldn't be the same kind of cost. Refresh my recollection, Mr. Quinlan. How big of a role did the company that developed the rain blocker system play in the trial? Not much role at all. I mean, the role was really – that the city deviated from the plan that the installer believed was essential to maximize its effectiveness. Maybe I misunderstood your question. I'm sorry. I was answering the question with respect to the company that might have actually built the rain blocker. Okay. So that's what I thought you were asking me. I'm sorry. With respect to – That was. That was or was not? But correct me now that you think it may have gone beyond that. Well, if you were asking with respect to HARSA, that's a different answer than the actual company that built the rain blocker. All right. And so with respect to the company – I was thinking HARSA. Okay. I'm sorry. I thought you were actually asking. So with respect to HARSA, all the reports were implemented, were brought into evidence. The various letters. HARSA, I would say, played a very large role to the extent – Live testimony? We had Paul Schadeke testify. And, again, we had the hand we were dealt. I was going to say he wasn't that good for you. No, he wasn't that great for me. And the only answer I can tell you is at the beginning, obviously, part of the reason we asked to reopen much of this was that this was the hand, this was the witnesses we had. He was not fantastic. But HARSA, as a company, and the documents that HARSA had, played a very large role with respect to the case, and we utilized those documents with respect to all the others. And just so it's clear from – in terms of the effort the trial judge or the rulings the trial judge made to give you as much leeway as possible, there was a footnote regarding the witnesses that were identified as possibly being called and the trial judge allowed that – didn't limit the plaintiffs to those main witnesses. That's correct, but she did limit it to witnesses that had been deposed. Okay. So there wasn't – That seems fair. I believe it was fair at the time. Obviously, we asked – given the ruling that we couldn't reopen Discovery, it was as fair as reasonably could be expected, given the circumstance. She did not require us to go forward just with Mr. Chang as our witness. That's correct. All right. So with that being said, we would ask this Court to reverse, based on the briefs and oral argument, reverse the findings and judgments of the trial court in entering judgment in favor of the plaintiffs, or alternatively, reversing the findings of judgment after trial and remand the matter for a new trial on the issue of liability, and reverse the trial court's finding that 2201 of the Tort Immunity Act bars plaintiffs' claims. Thank you for your honor's time. Thank you. Thank you very much. You've presented us a very interesting case and you've presented some very interesting arguments, so we'll take the case under advisement. Thank you very much. The Court's in recess. The Court's now in recess.